# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MARK SCHEIBE, | ) | CASE NO. 5:24-cv-432 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES ESQUE FLEMING |
| | ) | |
| v. | ) | |
| | ) | |
| WAYNE COUNTY, *et al.*, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendants. | ) | **ORDER** |

Before the Court is the Motion of Defendants, Wayne County, former Wayne County Commissioner Sue Smail, Wayne County Director of Environmental Services Steven Wolfe, and former Wayne County Auditor Jarra Underwood (collectively, "Defendants"), to Dismiss Plaintiff Mark Scheibe's Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  (ECF No. 10).  Scheibe timely opposed Defendants' Motion.  (ECF No. 11).  Defendants filed a Reply in support of their Motion.  (ECF No. 14).  Defendants subsequently filed, without leave of Court, a Reply in Support to Supplement the Record and to Dismiss Plaintiff's Claims Based Upon Res Judicata ("Supplemental Reply").  (ECF No. 19).  For the reasons set forth below, Defendants' Motion is **DENIED**.

## I.     FACTUAL BACKGROUND

On March 6, 2024, Scheibe filed this civil rights action under 42 U.S.C. § 1983 against Defendants.  (ECF No. 1, Compl., PageID #1–2).  He amended his Complaint on May 28, 2024.  (ECF No. 9).  Scheibe alleges that Defendants violated the Equal Protection Clause when they targeted him and: (1) inflated the estimated amount of one of his properties' sewage output, thereby causing him to pay a disproportionate amount of his sewage district's costs; and (2) selectively

1

increased the valuations of his properties causing significantly higher tax assessments when compared to other similarly situated properties.  (*Id.* at PageID #66, 70, 88).

Scheibe is a longtime resident of Wayne County.  (*Id.* at PageID #67).  He owns and leases out several rental properties throughout Wayne County.  (*Id.*).  In 2009, Scheibe's long-time banker, Jim Smail, approached Scheibe about taking over a delinquent equipment loan for the restaurant "East Side Moe's," located at 2179 E Lincoln Way, Wooster, OH 44691.  (*Id.* at PageID #69).  Scheibe agreed, purchased the property for $262,500.00, and renamed it "Fiore's Italian Ristorante."  (*Id.*).  Over the next three years, Scheibe invested over $100,000 into Fiore's.  (*Id.*).  Scheibe refinanced the property in 2012, and by 2020, Fiore's was profitable, generating $5,600 in monthly rent.  (*Id.*).

In 2016, Jim Smail's wife, former County Commissioner Sue Smail ("Smail"), was elected to Wayne County Board of Commissioners.  (*Id.* at PageID #67, 69).  Scheibe alleges that he and his businesses began experiencing disparate treatment from Wayne County employees following Smail's election.  (*Id.* at PageID #69).  First, Scheibe claims that Wayne County employees, at Smail's direction, selectively inflated Fiore's sewer bill based on an in-person audit that caused Fiore's to pay a disproportionate amount of Wayne County's overall sewage treatment costs.  (*Id.* at PageID #70).  Second, Scheibe claims that former Wayne County Auditor Jarra Underwood, again at Smail's direction, grossly inflated tax appraisals of his residence and two adjoining parcels compared to similarly situated residential properties.  (*Id.* at PageID #88).

### A.    Sewer Bills

The Wayne County Sewer District is divided into several smaller districts, which may opt to have a local Wayne County-owned-and-operated treatment plant treat their sewage or may use a lift station to transport the sewage to a remote treatment plant, not owned by Wayne County.  (*Id.*

at PageID #70–71).  The Hillcrest district, where Fiore's is located, sends its sewage to a Wooster-owned-and-operated treatment plant.  (*Id.* at PageID #71).  Wooster charges Wayne County a fixed rate per 1,000 gallons of treated sewage.  (*Id.*).  To recover theses costs, Wayne County bills property owners by estimating the theoretical amount of sewage in gallons a property is expected to produce at its maximum capacity.  (*Id.*).  These estimates come from the "Design Flow Requirements" for each of the types of properties found within the Ohio Environmental Protection Agency's Greenbook for Design Standards: Wastewater Treatment Plants & Collection Systems.  (*Id.*).  The Design Flow Requirements estimate the amount of sewage a particular type of property is expected to produce per day at peak rates.  (*Id.* at PageID #72).

Wayne County, at least ostensibly, evaluates properties in light of these Design Flow Requirements and then assigns them benefit units.  (*Id.* at PageID #71–72).  For every 400 gallons of sewage a property is expected to produce, the property is assigned one benefit unit.  (*Id.* at PageID #72).  Each sewage district then divides its costs among these benefit units, such that property owners with more benefit units pay a greater percentage of the district's overall costs.  (*Id.* at PageID #71).  Ordinary restaurants are expected to produce a maximum of 35 gallons of sewage per seat per day; a restaurant with 100 seats would be expected to produce a maximum of 3,500 gallons of sewage per day, for which Wayne County would charge 9 benefit units.  (*Id.*).

Scheibe alleges that Wayne County Director of Environmental Services Steven Wolfe and other Wayne County employees targeted Fiore's by overestimating its expected sewage output and applying its uniform method of assessing sewer rates to the inflated output.  (*Id.* at PageID #70).  Scheibe alleges they did this by failing to rigorously and uniformly apply the Design Flow Requirements, instead utilizing "an arbitrary and targeted process at the direction of Smail."  (*Id.* at PageID #74).

3

In 2016, following Smail's election, she purportedly instructed Wolfe to personally inspect Fiore's sewage output because Scheibe was "high profile."  (*Id.* at PageID #75–76).[1]  Wolfe claimed that he personally inspected Fiore's because it did not respond to a questionnaire sent to all Hillcrest property owners seeking information necessary to accurately estimate the Design Flow Requirements.  (*Id.* at PageID #76).  Scheibe alleges that this justification is false; the only questionnaires in Wayne County's files are from 2021, not 2016.  (*Id.* at PageID #76).  The Amended Complaint includes data showing that several Hillcrest properties in receipt of 2021 questionnaires did not respond to them, yet received no personal inspections.  (*Id.*).

Wayne County historically charged Fiore's a maximum of $391.79 per month in sewer bills.  (*Id.*).  After Wolfe's inspection, he notified Scheibe on May 24, 2017, that Wayne County increased Fiore's sewer bill to $968.21 per month.  (*Id.* at PageID #77).  Scheibe claims this calculation misunderstands the nature of his restaurant.  (*Id.*).  While Wolfe counted 306 seats, 196 of those seats were used seasonally; Fiore's indoor restaurant had 110 seats; the outdoor bar area used during warm months had 51 seats, and the 145 patio seats were only used as an event space for concerts during the warm months.  (*Id.*).  Wolfe told Scheibe that Wayne County reduced the total number of seats from 306 to 206 to account for Fiore's seasonal-use areas.  (*Id.*)  Nonetheless, Wayne County's failure to take the realities of Scheibe's restaurant into account cost Fiore's an additional eight benefit units, raising Fiore's total number of benefit units to 18 rather than 10, as Scheibe calculated.  (*Id.* at PageID #78).

---

[1] Scheibe alleges that, while Wolfe said Wayne County initiated an audit for all the Hillcrest district as a whole beginning in late 2016 and said his office had sent out questionnaires to all property owners in the Hillcrest district, Wayne County "has no evidence in its possession showing it ever sent out these questionnaires in 2016." (ECF No. 9, PageID #75–76).  According to Scheibe, the only questionnaires in Wayne County's files are from 2021.  (*Id.* at PageID #76).

According to Scheibe, the results of the 2016 audit were immediately applied to his monthly bill, which contrasts with how other property owners were treated after Wayne County completed another sewage audit in 2021.  (*Id.*).  During the 2021 audit, Wayne County assigned additional benefit units to nine properties, but allegedly did not increase their bills to reflect the increase in expected sewage output.  (*Id.*).  The 2021 audit also allegedly revealed the sewage output from eight commercial properties were underestimated.  (*Id.* at PageID #79).  In total, Scheibe claims that Wolfe and Wayne County underestimated and underbilled the sewage output of at least 17 of the 32 commercial properties in the Hillcrest district.  (*Id.* at PageID #81).  Fiore's purportedly paid 7.5% of the district's costs, as opposed to the 3.6% that Scheibe contends Fiore's should have paid for its expected maximum sewage output.  (*Id.*).

After he received Wolfe's May 24, 2017 letter, Scheibe protested the increase to Wolfe over the phone.  (*Id.* at PageID #82). On August 22, 2018, Wolfe sent Scheibe a letter stating his office's actions were "not personal," and that Wayne County was treating Fiore's like all other commercial properties.  (*Id.* at PageID #82–83).  The letter reminded Scheibe that Wayne County deducted 100 seats from the total number of seats to accommodate seasonal usage.  (*Id.* at PageID #83).[2]  Scheibe alleges that there was no administrative process to challenge Wolfe's decision, and that Wolfe did not provide him with a hearing to challenge the audit's findings.  (*Id.* at PageID #86).  At some point, Scheibe claims that Wolfe wrote a letter stating that the County would place a sewage meter on the Fiore's property to obtain actual, rather than estimated, sewage output

---

[2] In a February 14, 2019 email, Smail provided additional justifications for Fiore's sewer bills, including that Fiore's was only billed for 161 indoor seats and that two nearby motels were paying more in sewer bills per month. (ECF No. 9, at PageID #84).  She also stated that Fiore's earlier, much smaller bills were "a direct result of there being no audits done for some time," and that Fiore's sewer rates were not raised as they should have been.  (*Id.*).  In response, Scheibe alleges that Wayne County did bill him for Fiore's outdoor seating but had just reduced the amount of billing for those seats and that Wayne County had billed more comparable establishments than motels less than his property.  (*Id.* at PageID #84).

numbers.  (*Id.* at PageID #85).  Wolfe did not send the letter following a consultation with the Commissioners.  (*Id.*).

Scheibe refused to pay Fiore's sewer bills.  (*Id.*).  Wayne County therefore applied Fiore's delinquent bills to its property taxes, which as of June 14, 2023, amounted to $41,776.55 in charges and $9,493.69 in penalties.  (*Id.*).  Scheibe does not contest charges arising from the sole benefit unit attached to the Fiore's property since the restaurant closed in March 2020, amounting to $2,292.03.  (*Id.*).  On June 13, 2022, Wayne County filed a foreclosure action against Fiore's in Wayne County Court of Common Pleas.  (*Id.*).  A judgment and decree in foreclosure was issued on December 31, 2024.  *Koch v. Scheibe*, No. 2022 CVC-E 000243 (Wayne County C.P. Dec. 31, 2024).

Scheibe alleges that Smail maliciously targeted him by instructing Wolfe to audit and personally inspect Fiore's in 2016; by rejecting Wolfe's proposal to install a meter on the Fiore's property to accurately measure sewage output; by proffering "false reasons" for his sewer bill increase; and by foreclosing on Fiore's.  (*Id.* at PageID #86–87).  Scheibe alleges this ill-will has prevented him from reopening Fiore's and selling it to a third party.[3]  (*Id.* at PageID #87).  Because he has not received rent from Fiore's and cannot sell it, Scheibe has allegedly suffered over $268,800 in damages from lost rent.  (*Id.* at PageID #88).  Moreover, the foreclosure action negatively impacted his personal credit score, causing interest rates on loans for his other

---

[3] For instance, in his Complaint, Scheibe states that on March 15, 2020, he closed Fiore's in compliance with the Ohio Governor's Executive Order to close all bars and restaurants to in-house patrons to prevent the spread of the COVID-19 pandemic.  (ECF No. 9, PageID #87).  Given that Fiore's was primarily used as an event center, it could not operate as a dine-out establishment.  (*Id.*).  After closing the restaurant, Scheibe applied for a Paycheck Protection Program loan through one of Jim Smail's banks, Farmers National Banc Corp, but Scheibe claims that the bank "purposely failed to submit the application" for the loan in time for the first round of funding.  (*Id.*).  Consequently, Scheibe says he had to layoff Fiore's employees.  (*Id.*).  After the COVID-19 Executive Order was lifted in 2021, Scheibe says he could not reopen Fiore's due to costs arising from damage caused by a break-in, increased competition from a newly constructed event center, finding new employees, and his sewer bills.  (*Id.*).  Scheibe alleges that he has tried to sell the property but has been unable to do so because of his high sewer bills and "the uncertainty around the dispute," presumably with Wayne County.  (*Id.* at PageID #87–88).

businesses to rise as high as 18%.  (*Id.*).  He alleges these high interest rates and his inability to take out new loans have harmed his other business pursuits.  (*Id.*).  In sum, Scheibe claims that Wayne County's disparate treatment concerning Fiore's sewer bills, which he alleges was motivated by Smail's ill will and animus, has cost him "hundreds of thousands, if not millions of dollars in damages."  (*Id.*).

### B.    Property Taxes

In addition to his sewer bills, Scheibe alleges Wayne County and former Wayne County Auditor Jarra Underwood discriminated against him when they appraised his properties and increased the valuation of those properties and the assessment of his property taxes.  (*Id.* at PageID #88).  In 2023, Wayne County reported a 36.52% average increase in the value of all residential properties between 2020 and 2023.  (*Id.* at PageID #92).  Yet, over a four-year period, Underwood's tax assessment of Scheibe's personal residence, located at 10750 Esselburn Road, increased in value by 147% ($278,960 in 2018 to $691,500 in 2023).  (*Id.*).  According to Scheibe, the only change during that period was the construction of a 6,289-square foot pole barn in 2019, which Scheibe uses for storage and recreational purposes.  (*Id.* at PageID #89).  Scheibe owns two adjoining parcels that also increased significantly in value between 2018 and 2023 following tax assessments.[4]  (*Id.* at PageID #90–91).  In total, these adjoining properties and Scheibe's residence saw a 111% increase in taxable value between 2018 and 2023, causing a significant increase in Scheibe's property taxes.  (*Id.* at PageID #91).  Wayne County also assessed Scheibe's rental properties higher than the county average, with an average 54% increase over eight parcels.

---

[4] A property containing a 2,304-square foot pole barn, located at 10930 Esselburn Road, increased in value from $86,270 in 2018 to $141,160 in 2023 and a property containing a grass runway, barn, and cattle shelter, located at 8599 Snoddy Road, increased in valuation from $106,380 in 2018 to $163,700 in 2023.  (ECF No. 9, PageID #90).

At the same time, Smail's property valuation did not increase between 2020 and 2023.  (*Id.* At PageID #92).  Scheibe claims that Smail's favorable tax assessments—compared not only to himself, but to the other county commissioners—demonstrate her influence over Underwood and vicarious control over Wayne County tax assessments.  (*Id.* at PageID #93).

On March 15, 2019, Scheibe filed multiple complaints regarding the valuation of four of his properties, including his residence and adjoining parcels, with the Wayne County Auditor. (*Id.*).  Underwood scheduled a hearing for July 2, 2019, and sent a certified letter, notifying Scheibe of the hearing's date.  (*Id.*).  Scheibe alleges he did not receive the certified letter and missed the hearing.  (*Id.*).  At the hearing, Underwood and Wayne County Treasurer Melissa Koch denied Scheibe's request to reduce the valuations of his property.  (*Id.*).  Scheibe did not file another complaint with the auditor's office when his property taxes were raised again in 2023.  (*Id.*).  He believes that Smail again used her position to target Scheibe's property tax bills.  (*Id.* at PageID #94).

## II.    PROCEDURAL HISTORY

Scheibe filed his Amended Complaint on May 28, 2024.  He claims that Defendants have violated the Equal Protection Clause of the U.S. Constitution by treating his sewer bills and property taxes in a disparate manner. (*Id*. at PageID #95–97). Scheibe seeks compensatory and punitive damages, along with attorney's fees and costs.  (*Id.* at PageID #95; 96).

In their Motion to Dismiss, as well as in their Supplemental Reply (filed on February 5, 2025), Defendants argue that this Court lacks subject matter jurisdiction to hear Scheibe's claims because the Johnson Act and the Tax Injunction Act deprive this Court of subject matter jurisdiction; they alternatively assert that Scheibe failed to exhaust administrative remedies prior to bringing this case.  (ECF No. 10, PageID #100; ECF No. 19, PageID #189–91; 193–94).

8

Defendants also argue in their Supplemental Reply that the Court should abstain from hearing this case based on *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  (ECF No. 19, PageID #191–93).

Scheibe claims that this case does not implicate the Johnson Act.  (ECF No. 11, PageID #131–36).  He also argues that § 1983 claimants need not exhaust administrative remedies before filing suit and that, in any event, there were no "plain, speedy, and efficient" remedies available to address his grievances.  (*Id.* at PageID #135–38).

## III.    MOTION STANDARD

Defendants move to dismiss Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  (ECF No. 10).  The Court must first determine whether it has subject matter jurisdiction under Rule 12(b)(1), since lack of subject matter jurisdiction renders Defendants' Rule 12(b)(6) motion moot.  *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

A motion to dismiss pursuant to Rule 12(b)(1) may take the form of either a facial or factual attack. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  Facial attacks challenge the sufficiency of the pleading itself.  *Id.*  When adjudicating a motion to dismiss based upon a facial attack, the court must accept all material allegations of the complaint as true and must construe the facts in favor of the non-moving party.  *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235–37 (1974)).  Factual attacks, by contrast, challenge the factual predicate for subject matter jurisdiction, regardless of what is or might be alleged in the pleadings.  *Id.*  With such a challenge, no presumption of truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

Here, Defendants facially attack this Court's subject-matter jurisdiction, challenging whether the facts as alleged are sufficient to satisfy the requirements of the Johnson Act and the Taxation Injunction Act.  Therefore, the Court will accept all material allegations in the Complaint as true and will construe facts in favor of Scheibe, the non-moving party.  *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir. 1998).  Regardless of the type of attack, the plaintiff bears the burden of establishing that subject-matter jurisdiction exists.  *See Giesse v. Sec'y of Dept. of Health & Human Servs.*, 522 F.3d 697, 702 (6th Cir. 2008); *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 1990).

To survive Defendants' Rule 12(b)(6) motion, Scheibe's Amended Complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plausibility is not probability; plausibility "simply calls for enough fact to raise a reasonable expectation that discovery" will be fruitful. *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 556 (2007).  Ultimately, a claim is facially plausible when the plaintiff pleads facts that allow the court to draw a reasonable inference that the defendant is liable for his actions.  *Iqbal*, 556 U.S. at 678.

IV.  **DISCUSSION**

   A.   **Subject Matter Jurisdiction under the Johnson Act and Tax Injunction Act**

      1.   *Johnson Act, 28 U.S.C. § 1342*

Defendants argue that this Court lacks subject matter jurisdiction pursuant to 28 U.S.C. § 1342, also known as the Johnson Act.  (ECF No. 10, PageID #104–06).  Scheibe responds that the Johnson Act does not apply to this case because he has not contested Wayne County's uniform rates, but rather how Wayne County evaluated Fiore's maximum sewage output when compared with other, similarly situated properties.  (ECF No. 11, PageID #131–36).

10

The Johnson Act prohibits district courts, in certain circumstances, from "enjoin[ing], suspend[ing], or restrain[ing] the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision."  28 U.S.C. § 1342.  The Johnson Act applies when four elements are met:

> (1) Jurisdiction is based solely on diversity of citizenship or the repugnance of the order to the Federal Constitution; and
> (2) The order does not interfere with interstate commerce; and
> (3) The order has been made after reasonable notice and hearing; and
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

*Id.*  Before deciding whether the elements of the Johnson Act are met, the Court first considers two threshold matters: (1) whether the Johnson Act applies to claims for monetary, not injunctive, relief; and (2) whether the activities alleged by Scheibe fall within the meaning of "any order" as used in the statute.

Concerning the first, Scheibe seeks monetary damages, both compensatory and punitive. (ECF No. 9, PageID #96).  Despite the Johnson Act's language restricting its application to cases seeking injunctive relief, Defendants argue that the Johnson Act applies to this case, too.  (*Id.*). Defendants cite *Abcarian v. Levine*, 972 F.3d 1019, 1030–31 (9th Cir. 2020) for the proposition that courts should "broadly construe[] the statute" as encompassing declaratory relief and compensatory damages.  *Id.* (citing *Brooks v. Sulphur Springs Valley Elec. Coop.*, 951 F.2d 1050, 1054 (9th Cir. 1991); *Miller v. N.Y. State Pub. Serv. Comm'n*, 807 F.2d 28, 33 (2d Cir. 1986); *Tennyson v. Gas Serv. Co.*, 506 F.2d 1135, 1139 (10th Cir. 1974)); *see also Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1355 (11th Cir. 1986) ("Although the Johnson Act explicitly applies only to injunctive relief, it has been judicially extended to bar declaratory judgment and damage actions as well.").

While the Sixth Circuit has not yet expressed its interpretation of the Johnson Act, the Supreme Court adopted an identically broad interpretation of the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, which contains the same language: "[t]he district courts shall not *enjoin, suspend or restrain* the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." *Id.* (emphasis added); *Nat'l Priv. Truck Council, Inc. v. Okla. Tax Comm'n*, 515 U.S. 582, 586–88 (1995). This interpretation comes not from the TIA itself, but from the intrusive nature of a federal action on a state's ability to enforce its revenue collection systems. "[B]ecause of principles of comity and federalism, Congress never authorized federal courts to entertain damages actions under § 1983 against state taxes when state law furnishes an adequate legal remedy." *Id.* (citing *Fair Assessment in Real Estate Assn., Inc. v. McNary*, 454 U.S. 100, 116 (1981)). *See Hedgepeth v. Tennessee*, 215 F.3d 608, 612 n.4 (6th Cir. 2020) (acknowledging that the TIA "has been broadly interpreted to bar suits for declaratory relief, injunctive relief, as well as monetary relief when there is an adequate remedy in state court.").

The same concerns attend a money-damages action under the Johnson Act. As the Ninth Circuit pointed out in *Brooks*, "Although the primary evil the Act sought to remedy was the issuance of injunctions by federal courts against enforcement of state rate orders, legislators were also more generally concerned with protecting the authority of states 'to perform their proper functions in the supervision and fixing of rates, without interference of Federal law.'" 951 F.2d at 1054 (quoting 78 Cong.Rec. 8324 (1934) (statement of Rep. Mapes)). The Second Circuit cited even more legislative debate to explain that Congress never intended to reserve any federal jurisdiction in rate cases, regardless of the Johnson Act's text:

> Congressman Hancock of New York, in opposing the Johnson bill, stated that it would divest the federal courts "of all jurisdiction in public-utility cases." *Id.* at 8419. Congressman McGugin of Kansas railed against the interference by "injunction *and other orders* from the inferior federal

> courts." *Id.* at 8337 (emphasis added).  Congressman Kurtz of
> Pennsylvania, in answer to a question, agreed that "all the doors of the
> Federal Courts will be closed." *Id.* at 8423.  Congressman Lewis of
> Colorado expressed the sense of those supporting the Johnson bill when he
> commented: "The Johnson bill absolutely abolishes the jurisdiction of the
> United States courts in rate cases, and in rate cases only." *Id.* at 8328.

*Miller*, 807 F.2d at 32–33.  Given that the same federalism concerns that limit federal court jurisdiction under the TIA also arise under the Johnson Act, the Court concludes that the Johnson Act applies to the compensatory and punitive relief sought by Scheibe, and that this threshold matter is satisfied.

Nonetheless, for the Johnson Act to apply, Scheibe must contest activities that fall within the meaning of "any order affecting rates," as envisioned by the statute. 28 U.S.C. § 1342.  Relying on *Cannara v. Nemeth*, 21 F.4th 1169, 1175 (9th Cir. 2021), Defendants argue that the Johnson Act applies to both specific rate-setting orders and indirect challenges to those orders, and that this case, ultimately, is a rate case.  (ECF No. 10, PageID #103; ECF No. 14, PageID #148).  While true that *Cannara* opined that the Johnson Act broadly applies to "all suits affecting state-approved utility rates" and "any particular procedure" a rate-making system employs, the court still limited challenges to those regarding ratemaking.  *Cannara*, 21 F.4th at 1175.

The *Cannara* court grappled with a mandatory "wildfire surcharge" on the ratepayers' electric bills.  *Id.* at 1172.  The surcharge funded a program intended to cover liabilities incurred by electric utilities from wildfires.  *Id.*  Notably, proceedings to approve the surcharge were categorized as "ratesetting."  *Id.*  The ratepayers claimed that the surcharge violated their right to procedural due process and imposed "an unjust and unreasonable electric *rate*, thus effectuating a taking of utility customer property without just compensation."  *Id.* at 1173 (emphasis added).  Thus, when the Ninth District dismissed *Cannara*, it needed not venture outside the clear boundaries of the Johnson Act because there was little question that it was a rate-making case.

Scheibe does not challenge a ratemaking; rather, he protests the discriminatory way in which Defendants treated him. (ECF No. 11, PageID #132).  As he argues in his response Defendants' motion, Scheibe does not contest the legality of Wayne County's ratemaking, nor how it formally assigns benefit units, nor any other formal procedure, but merely the selective and unequal enforcement methods taken against him in particular.  (*Id.* at PageID #134).  The Johnson Act does not apply to such a challenge.  *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986).  For example, *Carlin* concerned a telephone company's denial of a message vendor's application to provide services for a fee.  *Id.*  The Eleventh Circuit found that, because the relief sought by the message vendor "would not in any way affect the rates established" by the telephone company, the challenge fell outside the scope of the Johnson Act.  *Id.*; *see Pope v. Clearwater*, 767 F. Supp. 1147, 1149 (M.D. Fla. 1991) (rejecting the applicability of the Johnson Act because *inter alia* the relief the plaintiff sought would not affect the rates established by the defendants).

Here, the relief Scheibe seeks does not in any way effect Wayne County's sewer rates.  As Scheibe argues, Wayne County, under statute, charges a "rate per benefit unit."  (ECF No. 11, PageID #132).  Benefit units are assigned one for each 400 gallons of estimated sewage output per day.  (*Id.*).  Scheibe's claims, if they succeed on the merits, will not affect this structure.  *See, e.g.*, *Norman Apartment Ass'n v. City of Norman*, 64 F. App'x 166, 167 (10th Cir. 2004) (affirming dismissal under the Johnson Act when an apartment association sought a declaratory judgment that a surcharge, which was a part of the city's water and sewer rate structure, violated the association's members' rights to equal protection and due process).

That said, the Court is not convinced that this case concerns "an order," let alone one affecting rates.  A Johnson Act "order" requires a "reasonable notice and hearing."  28 U.S.C. §

14

1342(3).  In *East Ohio Gas Co. v. City of Cleveland*, 23 F. Supp. 965 (N.D. Ohio 1937), this Court confined the definition of "order" to "the final legislative steps in the establishment of the rates" which were subject to state judicial review. *Id.* at 967.  That definition is consistent with *Cannara* (concerning a surcharge imposed after rulemaking proceedings, notice, and comment, which was an "order") and *Carlin* (concerning a utility's decision regarding a single entity, which was not an "order").  It is also consistent with the overall purpose of the Johnson Act, which is to "channel normal rate litigation into the State Courts while leaving the Federal Courts free in the exercise of their equity powers to relieve against arbitrary action."  *Hartford Consumer Activists Ass'n v. Housman*, 381 F. Supp. 1275, 1280 (D. Conn. 1974; *Meridian v. Mississippi Valley Gas Co.*, 214 F.2d 525, 526 (5th Cir. 1954)).

Scheibe does not contest an "order" that followed notice and hearing, but rather Defendants' allegedly discriminatory actions—personally inspecting Fiore's while failing to do so for others, resulting in Fiore's disproportionately high sewer bill.  If true, these acts did not derive from a uniform system of rates, but arguably arbitrary decisions targeting Scheibe. The Johnson Act therefore does not apply to the present case.  The Court declines, as moot, to evaluate whether the four elements of the Johnson Act are met.

### 2.    Tax Injunction Act, 28 U.S.C. § 1342

In Defendants' Reply, they argue that the TIA additionally blocks this Court's jurisdiction over this case.  (ECF No. 14, PageID #152–54).  The TIA prevents district courts from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1342.  Defendants argue that granting the relief Scheibe seeks would be "an improper invasion of the State and its localities' ability to levy and collect taxes."  As already addressed, the TIA

15

prevents actions for monetary damages as well as those for declaratory and injunctive relief.  *Nat'l Priv. Truck Council, Inc. v. Okla. Tax Comm'n*, 515 U.S. 582, 586–88 (1995).  However, for the same reasons that the Johnson Act does not bar jurisdiction, the TIA is similarly inapplicable.

Defendants acknowledge that Scheibe's tax claim is subject to the same analysis as his utility claim because the TIA was modeled after the Johnson Act and operates identically regarding taxes.   (ECF No. 14, PageID #153) (citing *Miller v. NYS Public Service Com.*, 807 F.2d 28 (2d Cir. 1986)); *see California v. Grace Brethren Church*, 457 U.S. 393 n.25 (1982).  Like the Johnson Act, the TIA operates "particularly to protect States' revenue raising mechanisms."  *BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 502 (6th Cir. 2008) (citing *Wright v. McClain*, 835 F.2d 143, 144 (6th Cir. 1987)) (internal quotations omitted).  When a lawsuit does not directly threaten the ultimate public benefit of raising tax revenue, the TIA does not apply.  *Id.* (citing *Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist.*, 166 F.3d 835, 838 (6th Cir. 1999)).

Such is the case here.  Scheibe does not contest Wayne County's property tax regime.  He challenges the allegedly arbitrary tax assessments of his properties resulting in his disparate treatment.  Accordingly, this Court is not jurisdictionally barred by the TIA from hearing Scheibe's Amended Complaint.

### B.    Exhaustion of Administrative Remedies

In their Motion and regarding Rule 12(b)(6), Defendants argue that Scheibe failed to exhaust available administrative remedies and that his claims should therefore be dismissed.  (ECF No. 10, PageID #107).  Scheibe argues that he was not required to exhaust administrative remedies before bringing his § 1983 claims.  (ECF No. 11, PageID #137–38).  In *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982), the Supreme Court held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983."  As

16

Scheibe argues, (ECF No. 11, PageID #137–38), and Defendants acknowledge, (ECF No. 19, PageID #188–89), the Sixth Circuit has applied *Patsy* on numerous occasions.  *See, e.g.*, *Miller v. City of Wickliffe*, 852 F.3d 497, 504 (6th Cir. 2017) (noting that "there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action") (citing *Patsy*, 457 U.S. at 507).

Defendants assert that *Patsy* applies only in the context of race and/or sex discrimination. (ECF No. 19, PageID #189).  The Court can discern no such a limitation, nor a policy reason for adopting one.  In *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 475 (2021), the petitioners partially owned a multiunit residential building in a tenancy-in-common, which they rented to another.  According to a San Francisco County program, such non-resident owners could only convert their tenancy-in-common to a modern condominium-style arrangement if they offered their tenant a lifetime lease.  *Id.* at 476.  Petitioners did so, but later petitioned the county to excuse them from executing the lifetime lease or compensate them for the lease.  *Id.*  When the county refused, the petitioners sued the county under § 1983, arguing that the lifetime-lease requirement was an unconstitutional regulatory taking.  *Id.*

Affirming dismissal, the Ninth Circuit concluded that the petitioners not only needed to show that the taking resulted from a "final" government decision, but also that they had complied with the county's administrative process for seeking relief.  *Id.* at 478.  The Supreme Court vacated the Ninth Circuit's opinion. The Court found that §1983's guarantee of "a federal forum for claims of unconstitutional treatment at the hands of state officials . . . includes 'the settled rule' that 'exhaustion of state remedies is *not* a prerequisite to an action under . . . § 1983.'"  *Id.* at 479 (quoting *Knick v. Twp. of Scott, Pa.*, 588 U.S. 180, 185 (2019)).

In another case more similar to this one, *Gracey Gen. P'ship v. Clarksville*, No. 3:23-cv-01189, 2025 WL 73249, at *12 (M.D. Tenn. Jan. 10, 2025), a plaintiff alleged they were a "class-of-one" due to the alleged selective enforcement of a city's demolition permits.  While the plaintiff ultimately did not sufficiently plead a "class-of-one" claim,[5] the court nonetheless found that the plaintiff did not need exhaust state remedies—judicial or administrative—to bring his § 1983 action.  *Id.* at *7, *12.    The Court finds that Schiebe was not required to exhaust state administrative remedies before bringing the instant action under § 1983.

### C.  Finality

 Defendants alternatively argue that even if Scheibe was not required to exhaust available state administrative remedies, he still must identify a final question for federal review.  (ECF No. 14, PageID #154).  Defendants are correct that the finality requirement remains intact for § 1983 claims.  *Miller*, 852 F.3d at 504.  "The finality requirement is concerned with whether the *initial* decisionmaker has arrived at a definitive position on the issue that inflicts an actual concrete injury."  *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193 (1985), *overruled on other grounds*, *Knick v. Twp. of Scott, Penn.*, 588 U.S. 180 (2019) (emphasis added).  This question is "conceptually distinct" from "whether administrative remedies must be exhausted."  *Id.* at 193 (citing *FTC v. Standard Oil Co.*, 449 U.S. 232, 243 (1980)).  An appeal from a local government's decision need not be taken to achieve finality, since an appeal serves merely to review the initial decision rather than participate in the decision making itself.  *Id.* Instead, it is the local government's enforcement of the decision against the plaintiff that results in injury, and thus, finality.  *Bench Signs Unlimited v. Jackson Twp. Zoning Dept.*, No. 5:96-CV-

---

[5] Defendants' have not contested the sufficiency of Scheibe's class-of-one claim for purposes of their motion to dismiss.

2070, 1996 WL 1070250, at *5 n.5 (N.D. Ohio Nov. 18, 1996) (citing *Williamson*, 473 US. at 193).

Finality is satisfied in Scheibe's case.  He alleges that he was injured by the enforcement of decisions rendered by Wayne County and its officials.  (ECF No. 1, PageID #24).  He specifically alleges he has suffered "hundreds of thousands of dollars in damages ranging from assessed sewer bills, lost rent, reduced property value, and increased interest rates."  (*Id.*).  This is distinct from *Miller*, upon which Defendants rely, because the *Miller* plaintiffs never applied for the permit they alleged would have been denied; there was no decision for the court to review.  *Miller v. City of Wickliffe*, 852 F.3d 497, 504 (6th Cir. 2017).

Here, Wolfe informed Scheibe of Fiore's new sewer bill amount on May 24, 2017, and billed Fiore's accordingly.  (ECF No. 9, PageID #77) ("On May 24, 2017, Wolfe sent Scheibe the following letter in which he informed him as a result of the audit, Wayne County will increase Fiore's Property sewer bills to $968.21 per month – a massive increase of $591.42 per month); (*id.* at PageID #81) ("Thus, from 2017 to 2020 while Wolfe was aggressively auditing and billing the Fiore's property, his department was underestimating sewage for at least 17 of the 32 commercial properties in the Hillcrest system.").  Smail's later email to Scheibe acknowledges that Fiore's had been billed for the new amount, and that Wayne County would not take further action regarding the sewer bills.  (*Id.* at PageID #84).  Regarding Scheibe's property taxes, the Amended Complaint explains that the valuations occurred and resulting property taxes assessed.  (*Id.* at PageID #90) (addressing Scheibe's residence and two adjoining parcels); (*id.* at PageID #98) (addressing Scheibe's rental properties).  Since Defendants enforced both the sewer bill and property tax amounts against Scheibe, the finality requirement is satisfied.

D.    *Burford* **Abstention**

The final issue before the Court is whether it must abstain from adjudicating this controversy.  (ECF No. 19, PageID #191–93).  Defendants argue that this case implicates "difficult questions of state law bearing on policy problems of substantial public import" and that the Court risks "jeopardiz[ing] the state and local schemes and policies in place to provide Ohioans with sanitary sewage treatment systems."  (ECF No. 19, PageID #192).[6]

Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it."  *Saginaw Hous. Comm'n v. Bannum, Inc.*, 576 F.3d 620, 625 (6th Cir. 2009) (citing *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 467 (6th Cir. 2009).  In *Burford v. Sun Oil Co.*, 319 U.S. 315, 318, 332 (1943), the Supreme Court explained that, in certain cases, abstention "further[s] the harmonious relation between state and federal authority"; it further explained that,  when faced with an equitable claim, federal courts "should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy."  Thus, the *Burford* abstention doctrine was formed:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

---

[6] Defendants raise an additional question as to whether the Court's decisions in this case will improperly disrupt the ongoing foreclosure action in state court.  (ECF No. 14, PageID #154).  The Court takes judicial notice that the state court foreclosure action concluded on December 31, 2024, though Scheibe has appealed that decision.  *Koch v. Scheibe*, No. 2022 CVC-E 000243 (Wayne County C.P. Dec. 31, 2024), https://courtsweb.waynecourts.org/publicaccess/Image.aspx/PDFViewer2?cid=110557101&digest=DUP%2BupUx RFzrwSiJ0rsomw; *Koch v. Scheibe*, No. 30993 (Ohio Ct. App. Feb. 5, 2025).

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans ("NOPSI")*, 491 U.S. 530, 361 (1989) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976); *Burford*, 319 U.S. at 325, 331.

A party seeking *Burford* abstention carries the burden of demonstrating that abstention is appropriate. *Tennessee v. Waters*, No. 3:10-CV-268, 2010 WL 4941695, at *3 (E.D. Tenn. Nov. 30, 2010) (citing *Gray v. Bush*, No. 1:08-cv-631, 2009 WL 567189, at *6 (W.D. Mich. Aug. 17, 2009). In the Sixth Circuit, the *Burford* abstention doctrine only applies in the context of statewide, not local, policies. *Saginaw*, 576 F.3d at 628.

Defendants have not shown that there are statewide policies that this case places at risk. Defendants assert that Scheibe contests "the administrative scheme in place to review properties and calculate their sewer rates based upon policies promulgated by the Ohio EPA in the Greenbook,"; however, the Court has found elsewhere in this Opinion that Scheibe's claims do not risk upturning those policies, which are apparently made on a county-wide, not state-wide, basis. (ECF No. 19, PageID #193); (*supra* at 15, 16). *Burford* abstention is therefore inappropriate.

## V.    CONCLUSION

For the reasons set forth above, this Court has subject matter jurisdiction to consider both counts of Scheibe's Amended Complaint. As a § 1983 plaintiff, Scheibe had no obligation to exhaust administrative remedies before filing this case, and the Amended Complaint adequately alleges Defendants' enforcement of two final decisions resulting in Scheibe's alleged actual, concrete injury. There are also no grounds upon which this Court must abstain from hearing this case. As such, Defendants' Motion to Dismiss Under 12(b)(1) and 12(b)(6) is **DENIED.**

**IT IS SO ORDERED.**

Date: May 22, 2025

_____
**CHARLES E. FLEMING**
**UNITED STATES DISTRICT JUDGE**